Matthew M. Pruitt (Utah Bar No. 18515)
Jack M. Mitchell (Utah Bar No. 19627)
**KIRTON MCCONKIE**
301 N. 200 E., Suite 3A
St. George, Utah 84770
Telephone: (435) 574-5672
Facsimile: (385) 501-4989
mpruitt@kmclaw.com
jmitchell@kmclaw.com

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JAMES BLOOMFIELD, an individual, and TRINA BLOOMFIELD, an individual,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF ST. GEORGE, a municipality of the State of Utah, SCOTT TAYLOR, an individual, DEAN ALMODOVA, an individual, JOHN WILLIS, an individual, CAROL WINNER, an individual, MICHELLE TANNER, an individual, STEVE KEMP, an individual, DANNIELLE LARKIN, an individual, JIMMIE HUGHES, an individual, NATALIE LARSEN, an individual, and JOHN and JANE DOES 1 through 10,<br><br>    Defendants. | **COMPLAINT**<br><br>Case No.<br><br>District Judge:<br><br>Magistrate Judge: |

Plaintiffs, James Bloomfield and Trina Bloomfield, (Bloomfields), by and through their counsel of record, Kirton McConkie, hereby plead, allege, and complain against Defendants (the City of St. George or City), as follows:

4904-3760-1707.v2

## INTRODUCTION

1.      This is a federal civil rights lawsuit against the City of St. George and various City officials for their abuse of the land-use permitting process to attempt to compel the Bloomfields to replace or relocate the City's existing municipal sewer line adjacent to their land at their expense.

2.      The Bloomfields own two lots of real property in the Hyde-Berry Park Subdivision of St. George. One is a developed residential lot containing their home and yard. Their other non-contiguous lot is the lot on which they seek to build a barn and a swimming pool.

3.      Other owners in the neighborhood have received the City's permission to install pools, erect barns, or construct other improvements on nearby lots comparable to the Bloomfields'.

4.      Separating the Bloomfields' residential lot from their undeveloped lot is a thirty-foot strip of bare land that the City owns in fee simple and uses as a utility corridor referred to as Parcel B. Beneath Parcel B is a City-owned sewer line, and the portion of Parcel B that passes between the Bloomfields' lots is undeveloped but for grass and dirt.

5.      The City has told the Bloomfields and other St. George residents that the sewer line beneath Parcel B and elsewhere in Hyde-Berry Park needs to be replaced or relocated.

6.      The Bloomfields and other residents in Hyde-Berry Park have complained to City officials that the City's fee simple ownership of Parcel B and similar public utility corridors in their area has impeded the aesthetics, access, and development of adjoining private property.

7.      The City's ownership of Parcel B and sewer line predate the Bloomfields' purchase of their lots, the development of their residential property, their applications to build a barn or swimming pool, and any dispute between the Bloomfields and the City.

2

8. Both the Bloomfields' applied-for pool and barn would be located on their own property, not Parcel B. And constructing these improvements would have no effect on Parcel B.

9. The City has a legitimate interest in inspecting, maintaining, and replacing sewer lines, but the City has no authority to condition the Bloomfields' use of their own property on their agreement to purchase Parcel B, pay for new sewer lines, relocate existing sewer lines, grant new easements, or otherwise solve the City's public-infrastructure needs that are unaffected by the Bloomfields' use of their own property.

10. In 2023, the Bloomfields approached City officials Scott Taylor and Jay Sandberg for an informal evaluation of their proposal to build a barn and a pool on their undeveloped lot. These officials indicated that the proposal appeared to comply with City ordinances and likely would be approved.

11. On or about July 25, 2023, the Bloomfields submitted formal applications for permits to construct a pool and a barn. Months later, the City issued a permit for the barn and sent the Bloomfields a notification indicating a permit for the pool had been issued as well, along with a pool-permit number and City-issued records demonstrating the seeming authenticity of the pool approval.

12. After the City issued the barn permit, it inspected and approved the barn's footings and foundation, and later approved the barn's framing.

13. Yet the City refused the Bloomfields' request to connect utilities to the barn beneath Parcel B until they filled in the hole excavated for the swimming pool and abandoned that project.

14. Even though the Bloomfields had a permit and completed inspections for their barn—and despite the Hyde-Berry Park landowners' rights to access their property across Parcel

B—the City issued a stop-work order on the barn construction, withheld access and utility approval, and issued a notice of violation to the Bloomfields falsely alleging that the barn inspections had not occurred. When the Bloomfields showed that the inspections were completed, the City threatened criminal prosecution and filed unfounded criminal charges against them.

15.     After the Bloomfields formally applied for a pool permit in July 2023, the City accepted the application into plan review, requested clarification that the pool would be located on the Bloomfields' undeveloped lot, and initially approved the pool plans.

16.     But on the same day that it approved the pool plans, the City reversed course—denying the permit on the specious ground that a swimming pool was an accessory structure that must be located on the Bloomfields' residential lot, even though their residential and undeveloped lots are separated only by Parcel B.

17.     The City later sent the Bloomfields notice that the pool permit was issued and even assigned the Bloomfields a pool-permit number. Despite this, the City later halted the Bloomfields' work on the pool.

18.     Carol Winner escalated the dispute during a personal visit to the Bloomfields' home. She told the Bloomfields they would be trespassing if they crossed Parcel B to access their undeveloped lot and contended that the pool was impermissible because it was located on a lot zoned "Open Space." She did not explain how this could be so when other Open Space lots in other subdivisions contain pools.

19.     The City then converted what began as a permitting and access dispute into criminal enforcement by charging the Bloomfields in criminal court with building a pool in Open Space.

4904-3760-1707.v2

20. City officials have told the Bloomfields that they can eliminate the City's opposition to building a barn and pool on their property by agreeing to replace or relocate the City-owned sewer line beneath Parcel B. The City thus admitted to using the permitting process to pressure the Bloomfields into replacing or relocating a City-owned utility at their own expense.

21. The City's demands are unconstitutional exactions under the Fifth and Fourteenth Amendments because there is no essential nexus or proportionality between the Bloomfields' proposed residential swimming pool and barn and the City's demand that the Bloomfields replace or relocate the City's public sewer infrastructure at their own expense.

22. The City's abuse of the permitting process also violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as statutes under federal and state law.

23. Plaintiffs bring this action under 42 U.S.C. Section 1983, the Fifth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, the Fair Housing Act, Utah law, and the Declaratory Judgment Act.

## PARTIES

24. Plaintiff James Bloomfield is an individual residing in Washington County, Utah.

25. Plaintiff Trina Bloomfield is an individual residing in Washington County, Utah.

26. Defendant City of St. George is a municipal corporation organized under Utah law.

27. Defendant Scott Taylor is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

28. Defendant Dean Almodova is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein

5

29. Defendant John Willis is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

30. Defendant Carol Winner is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

31. Defendant Michelle Tanner is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

32. Defendant Jimmie Hughes is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

33. Defendant Steve Kemp is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

34. Defendant Dannielle Larkin is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

35. Defendant Natalie Larsen is an individual residing in Washington County, Utah, and is, and/or was, an officer, employee, or agent of the City during the events alleged herein.

36. At all relevant times, the City acted through its officers, employees, agents, departments, inspectors, attorneys, engineers, utility personnel, planners, code-enforcement personnel, and final policymakers.

37. At all relevant times, the City and its officials acted under color of state law.

## JURISDICTION AND VENUE

38. This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 because Plaintiffs assert claims arising under the United States Constitution, 42 U.S.C. Section 1983, the ADA, and the FHA.

6

4904-3760-1707.v2

39.    This Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. Section 1367.

40.    This Court may grant declaratory and injunctive relief under 28 U.S.C. Sections 2201 and 2202 and Federal Rule of Civil Procedure 65.

41.    Venue is proper in this District under 28 U.S.C. Section 1391 because the City is located in this District, the disputed property is located in this District, and the events giving rise to the Bloomfields' claims occurred in this District.

## GENERAL ALLEGATIONS

### A.    The City's Acquisition of Parcel B in Fee Simple Through the Hyde-Berry Park Subdivision Approval Process

42.    Before the Bloomfields purchased their properties, the City's sewer infrastructure already ran through the land that later became known as Parcel B.

43.    Controversy involving Parcel B did not originate with the Bloomfields' purchase of their properties, their applications for a pool and barn, or any improvement constructed by the Bloomfields.

44.    Controversy arose because of the City's decision to acquire Parcel B outright during the development of the Hyde-Berry Park Subdivision.

45.    Hyde-Berry Park was developed by or through Benji Nelson and related persons or entities.

46.    During the early stages of development, the civil engineer hired by Benji Nelson to assist in the Hyde-Berry Park Subdivision found a sewer line running beneath the subdivision for which there was no recorded easement or other property interest in favor of the City.

7

4904-3760-1707.v2

47.    Nelson informed the City of the sewer line and the absence of a recorded easement or other property interest in favor of the City.

48.    Upon information and belief, the City expressed concerns about allowing Nelson to complete the Hyde-Berry Park Subdivision because the disclosed sewer line ran through or near proposed residential lots and raised concerns regarding future construction, access, maintenance, repair, and flood-related protection of the sewer line.

49.    The City required Nelson to upgrade and fortify the City sewer line as a condition of developing the Hyde-Berry Park Subdivision.

50.    Nelson spent approximately $250,000 to upgrade and fortify the City sewer line.

51.    As another condition of approving the Hyde-Berry Subdivision's final development, the City required Nelson to grant it fee title to the land over and around the City sewer line. That land became known as Parcel A and Parcel B. The Bloomfields' lots touches Parcel B only. The City also took a utility easement within Hyde-Berry park for maintenance of a separate portion of the City's sewer infrastructure.

52.    Thus, the City has acted inconsistently with regard to the same sewer line in the same subdivision: the City took Parcel A and Parcel B over the sewer line in fee ownership while taking only a utility easement over another portion of the same sewer line in Hyde-Berry Park.

53.    The City's acquisition of fee title ownership materially differs from the City's normal practice of obtaining an easement to support the maintenance and repair of municipal utilities. Indeed, the City has taken utility easements for access, repair, and maintenance in other parts of Hyde-Berry Park.

4904-3760-1707.v2

54. A utility easement would have protected the City's legitimate interest in accessing, maintaining, repairing, replacing, and operating its existing sewer infrastructure.

55. Fee-title ownership, by contrast, gave the City broader ownership rights over a strip of land physically separating privately owned residential lots from non-contiguous open-space or agricultural lots held by the same owner. For a visual understanding of the Bloomfields' property and the City's Parcel B, see the parcel map attached hereto as **Exhibit 1**. The Bloomfields residential lot and Open Space lots are the lots highlighted in light blue on Exhibit 1, page 1.

56. Upon information and belief, the City did not conduct an individualized determination that fee-title ownership was necessary to mitigate public impacts beyond what a utility easement would accomplish before demanding fee-title ownership of Parcel B.

57. The City's fee-title ownership of Parcel B has created problems for Hyde-Berry Park residents. They have complained that the City's fee title ownership rather than holding a customary utility easement detracts from the appearance and utility of residential properties and restricts private development and use of lots bordering Parcel B in Hyde-Berry Park.

58. The City's acquisition of Parcel B is relevant to show that any political or administrative issues related to the City's eccentric acquisition of Parcel B arose from the City's decisions long before Plaintiffs' application to build a pool or a barn were ever submitted to the City.

59. Furthermore, the City's acquisition of Parcel B from Benji Nelson is also relevant as evidence that the City has previously engaged in using land-use approvals as leverage to obtain private property interests beyond what the City's legitimate interests require.

60. The same pattern later repeated itself with the Bloomfields.

61.     After the Bloomfields applied for and relied on approvals for improvements on their own property, the City again used land-use approvals, inspections, utilities, certificates of occupancy, and enforcement threats as leverage to try to force resolution of the City's preexisting Parcel B and sewer-line problem.

62.     The City's later position was not merely that the Bloomfields could not obstruct sewer access.

63.     Instead, the City used the existence of Parcel B and the City's claimed fee-title ownership as a basis to stop or impair the Bloomfields' separate pool and barn approvals, utility access, property use, and completion of improvements that were not constructed on Parcel B.

64.     The Bloomfields plead these facts behind the City's fee title ownership of Parcel B to explain its origins, the City's municipal policy and practice, and the City's previous abuse of land-use authority during the development of Hyde-Berry Park as leverage to obtain property or infrastructure concessions.

65.     The Bloomfields reserve the right to amend this Complaint after discovery to add further facts concerning the City's communications with Benji Nelson, specific City officials, the development permits or approvals threatened, the City's file on the Hyde-Berry Subdivision, and the City's internal communications regarding the acquisition of Parcel B to the extent these are relevant to the claims below.

**B.     The Bloomfields' Property and Parcel B**

66.     The Bloomfields own real property located in St. George, Utah.

10

4904-3760-1707.v2

67.    The Bloomfields' property consists of two noncontiguous lots, a residential lot approximately a third of an acre in size (residential lot), and a lot zoned as Open Space approximately two-thirds of an acre in size (Open Space lot).

68.    The residential lot contains the Bloomfields' home and yard, while the Open Space lot is where the Bloomfields are seeking to construct a barn and a swimming pool.

69.    In the St. George City Municipal Code, "Open Space" is a zoning designation that provides for permitted uses, including active recreation areas. See St. George City Code § 10-11-1. More than one of the Bloomfields' neighbors have been permitted to develop improvements on their Open Space parcels, including pickleball courts, sport courts, playgrounds, swimming pools, and others. One of those neighbors is a former St. George City mayor, who has a swimming pool on his Open Space lot.

70.    The Bloomfields' residential and Open Space lots are separated by Parcel B. See Exhibit 1.

71.    Parcel B is a 30-foot utility corridor owned by the City, beneath which runs the City's sewer infrastructure.

72.    For the Bloomfields to access their Open Space lot, they must physically cross Parcel B. And for the Bloomfields to connect electricity and plumbing from their residential lot to a barn and a pool on the Open Space lot, those utility lines must be installed in subsurface lines that necessarily cross Parcel B.

73.    The City owns Parcel B in fee simple as an exaction obtained from the developer of the Hyde-Berry Park subdivision.

11

74.    The City's acquisition of Parcel B long predated the Bloomfields' purchase of their residential and Open Space lots and their dispute with the City over permits to construct a barn and a pool.

75.    Ordinarily, the City requires a utility easement in order to access its sewer infrastructure beneath private land. This approach allows landowners to retain fee title to their property while also protecting the City's need to access its infrastructure. But in Hyde-Berry Park, the City owns fee title to Parcel B, a utility corridor crisscrossing private property.

76.    Hyde-Berry Park Covenants, Conditions and Restrictions (CC&Rs) state that the owners of the lots abutting Parcel B are responsible for maintaining the surface of Parcel B in a condition which will not interfere with the City's maintenance of the underground sewer line. While owners may not erect permanent structures on Parcel B, it has been the understanding of the City and landowners of Hyde-Berry Park since the development of the subdivision that the landowners could cross Parcel B to access their Open Space lots. On this way can landowners comply with the requirement to maintain their lots in an attractive, safe, and healthy condition, and develop their lots as desired.

77.    Additionally, upon information and belief, the Bloomfields entered into an access agreement with the City after the Bloomfields purchased their lots in Hyde-Berry Park. The access agreement provided the Bloomfields with the right to cross Parcel B so they could access their Open Space lot for use and development.

78.    The City's fee title ownership of Parcel B has created aesthetic, access, and development conflicts for the Bloomfields and adjoining landowners in Hyde-Berry Park despite

12

the common understanding that the landowners of Hyde-Berry Park have a limited easement across Parcel B.

## C.    The Bloomfields' Pool and Barn Applications

79.    The Bloomfields desire to construct a barn and swimming pool on their Open Space lot.

80.    The Bloomfields' Open Space lot is located behind their residential lot and is separated from their residential lot by Parcel B.

81.    In 2023, before submitting permit applications for the barn and pool, the Bloomfields consulted with City staff regarding whether the barn and pool were permissible and whether the City would allow electricity and plumbing connections to cross Parcel B to the barn and pool. Connecting these utilities from the Bloomfields' residential lot to their Open Space lot would require crossing Parcel B underground. But the utilities would not interfere with the City's sewer infrastructure under Parcel B.

82.    When the Bloomfields met with City representatives, specifically, Jay Sandberg and Scott Taylor, the Bloomfields discussed the necessity of the pool for Trina Bloomfield's medical condition.

83.    City representatives told the Bloomfields that the proposed barn and pool were permissible and that utilities for the barn and pool could cross Parcel B underground.

84.    Acting in reasonable reliance on the City's representations, the Bloomfields spent time and money to pursue design, permitting, construction planning, and commencing construction of the barn and pool before applying with the City for permits.

4904-3760-1707.v2

85. On or about July 25, 2023, the Bloomfields submitted a formal permit application for the barn.

    a. On or about July 26, 2023, the Bloomfields completed the barn's footings and foundation.

    b. On or about August 29, 2023, the City issued the Bloomfields a building permit for the barn.

    c. On or about October 19, 2023, the barn passed a footing inspection.

    d. On or about October 20, 2023, the barn passed a foundation inspection.

    e. On December 26, 2023, the Bloomfields received a letter from the City stating that the City would grant them an access and municipal utility easement across Parcel B so that they could access and run utilities to the barn. The letter added, "[h]owever, before the City will grant the MUE, [the Bloomfields] must discontinue installation of the swimming pool, fill it with dirt or comparable material, and fully and completely abandon any use of it as a pool."

    f. This letter effectively halted construction of the barn despite the permit previously issued for it. By denying the MUE, the City contradicted Hyde-Berry Park CC&Rs expressly granting landowners access to their Open Space lots across Parcel B.

    g. The letter failed to identify any legal basis for demanding that the Bloomfields destroy work on their pool and "abandon" its installation, much less a legal basis for withholding the MUE until the Bloomfields complied with this demand.

    h. On or about March 28, 2024, the barn passed a framing inspection.

4904-3760-1707.v2

i. On or about June 19, 2024, the Bloomfields received a "Courtesy Notice" from the City, delivered by Dean Almodova, alleging that the Bloomfields had violated City ordinances pertaining to zoning and building. In that Notice, the City alleged that the Bloomfields had not completed footing or framing inspections for the barn and that they had a chicken coop added to the rear of the barn without being presented to the City in the construction plans.

j. On July 11, 2024, the Bloomfields sent a written response to Dean Almodova addressing the City's Courtesy Notice, which explained that (i) footing and framing inspections had been completed for the barn and (ii) Casey Johnson in the City building department told the Bloomfields that they did not need to include the chicken coop in the barn construction plans, or obtain a City permit for it, if the coop has no footings, water, or electricity.

k. The City then issued a notice of violation on August 5, 2024, alleging that the Bloomfields may be criminally prosecuted for violating City ordinances.

l. The following month, in September 2024, the City filed criminal charges against the Bloomfields for alleged violations of City zoning and building ordinances. In particular, the City charged the Bloomfields with building a pool in an Open Space zone and constructing a structure without a permit. Despite inquiries with the City prosecutor, the Bloomfields still do not understand the precise legal grounds for these charges.

86. On or about July 25, 2023, the Bloomfields submitted a formal permit application to build a swimming pool on their Open Space lot.

15

4904-3760-1707.v2

a. On July 27, 2023, the permit application was accepted by the City into the plan review stage of permit issuance.

b. Despite having the design plans for the pool, on August 2, 2023, the City asked the Bloomfields to clarify where the pool would be located on the Bloomfields' property. The Bloomfields responded on the same day indicating that the pool would be located on their Open Space parcel.

c. On August 7, 2023, the City approved the Bloomfields' plans for the pool, but on the same day placed the application back into the review stage of the process on the specious ground that "[a] swimming pool is an accessory structure to the main home and needs to be located on the lot with the home," which lot is the Bloomfields' residential lot. The Bloomfields' residential lot and Open Space lot are non-contiguous properties separated by Parcel B.

d. On or about October 4, 2023, the City sent the Bloomfields a permit-issued notification, approving the swimming pool, along with Pool Permit No. 23-1670.

e. Yet the following day, on or about October 5, 2023, the City issued a stop-work order on the Bloomfields' pool, then under construction. The order came after the concrete for the Bloomfields' pool had been poured. Since then the Bloomfields have performed no additional work on their pool.

f. On November 30, 2023, Carol Winner, the City's Interim Development Director, visited the Bloomfield home to discuss their barn and pool. Winner repeatedly said that the Bloomfields would be trespassing if they crossed Parcel B to access their Open Space lot. She made this threat despite Hyde-Berry Park CC&Rs that grant

16

landowners an easement across Parcel B. Winner also told the Bloomfields that their pool was impermissible because of its placement on a lot zoned Open Space. She did not explain why that zoning restriction precluded the Bloomfields' development plans when other Open Space lots in the community contain pools.

g. The City later made good on Winner's threat by charging the Bloomfields in criminal court with building a pool in Open Space.

87.     Despite the fact that the City has not allowed the Bloomfields to usefully develop their Open Space lot, the City has begun taxing their Open Space lot as if it has been improved. According to Washington County records, the Bloomfields were taxed $70.67 for their Open Space lot in 2024. In 2025, the taxes on the Open Space lot rose to $1,162.08.

88.     Upon information and belief, the City council—Defendants Michelle Tanner, Dannielle Larkin, Steve Kemp, Jimmie Hughes, and Natalie Larsen—has ratified the City's actions taken against the Bloomfields' applications and permits for the barn and pool. This belief comes from statements made by Defendant John Willis and City attorney Ryan Dooley that the City council had been provided with all pertinent information relating to Parcel B, and Hyde-Berry Park residents' issues with Parcel B, and made its decision accordingly.

**D.     The City Unconstitutionally Conditions the Bloomfields' Property Use.**

89.     After the Bloomfields began construction on the barn and swimming pool, the City rescinded permission to construct the pool, ordered a halt to the barn construction, and imposed additional conditions for both improvements.

90.     On or about October 5, 2023, the City issued a stop-work order on the pool.

17

91.     The City later claimed that Pool Permit No. 23-1670 was invalid despite City-generated documents and communications indicating that the permit had been validly issued.

92.     City inspection notes or project flags for the barn stated that utilities for the barn could not be connected and a municipal utility easement would not be granted until the City's objections to building a pool on the Bloomfields' Open Space lot were resolved and directed the Bloomfields to contact City utilities staff to resolve the issue.

93.     City staff added conditions to approval for the barn and pool that did not exist when the Bloomfields applied for permits or when the permits issued. For example, the City demanded that the Bloomfields abandon the construction of their pool as a condition of getting permission to connect utilities for the barn on the Bloomfields' Open Space lot.

94.     The City went further by impairing or denying inspections and completion approvals of the Bloomfields' improvements by invoking the City's title ownership of Parcel B, a parcel that separated the Bloomfields' residential lot from the Open Space lot where they were constructing their improvements.

95.     The City explained that the pool construction could proceed if the Bloomfields agreed to pay for the sewer line beneath Parcel B to be relocated or replaced. With that agreement, City officials explained, Parcel B would be granted to the Bloomfields, thereby removing any barrier between the Bloomfields' residential and Open Space lots.

96.     The City used these and other conditions to block the Bloomfields from constructing the barn and pool on their own property.

97.     The City imposed these conditions after the Bloomfields detrimentally relied on the City's representations that they would be allowed to construct the barn and pool.

18

98. These additional conditions were unrelated to the construction of a barn and a pool on the Bloomfields' land.

99. Upon information and belief, the City council has endorsed the City's ultimatum to the Bloomfields regarding the Bloomfields replacing or relocating the City's sewer line in exchange for the ability to build their barn and pool. This belief comes from statements made by Defendant John Willis and City attorney Ryan Dooley that the City council had been provided with all pertinent information relating to Parcel B, and Hyde-Berry Park residents' issues with Parcel B, and made its decision accordingly.

100. Thereafter, in July 2024, the City issued Notice of Violation letters and pursued enforcement against the Bloomfields by charging them with criminal violations of the City building and zoning code.

101. In September 2024, the City initiated criminal proceedings against the Bloomfields. The City alleged that the Bloomfields violated St. George City code 10-11-1, for attempting to build a pool on a parcel zoned as Open Space, and St. George City code 9-10-1.A, for constructing a structure without a residential building permit.

102. To date, and despite conversations with City prosecuting authorities, the City's basis for alleging that the Bloomfields violated St. George City code 9-10-1.A is unclear.

103. Criminally prosecuting the Bloomfields has nothing to do with regulating access to Parcel B or preventing them from interfering with the City's maintenance and repair of the subsurface sewer line beneath Parcel B. The Bloomfields' barn and pool projects will be located on their Open Space lot, not on Parcel B. Instead, the City exploited the permit process to coerce the Bloomfields into replacing or relocating the City's sewer line at the Bloomfields' expense.

4904-3760-1707.v2

**E.      The City's Parcel B and Sewer-Infrastructure Demands**

104.    On or about September 12, 2024, Plaintiff James Bloomfield met with City representative Scott Taylor to discuss what needed to be done to finalize permission for the Bloomfields to connect utilities underground through Parcel B to the barn.

105.    James Bloomfield met with Scott Taylor because James was told by the City's building department in a building inspection for the barn that he needed Scott Taylor's final approval for the barn's utilities.

106.    Taylor told James Bloomfield to map out the utilities that the Bloomfields needed for the barn and to move forward with getting the legal description of the portion of Parcel B the utilities would cross so that the utilities could be connected to the barn underground through Parcel B.

107.    Taylor also told Bloomfield that the City would have no need for Parcel B if the Bloomfields would pay to replace, repair, or relocate the existing sewer line under Parcel B.

108.    Taylor suggested that this could be done by removing the sewer line from under Parcel B, running a new sewer line south, parallel to the Bloomfields' residential and Open Space lots, and connecting that sewer line into a new main sewer line that the City planned to construct south of the Bloomfields' properties.

109.    Taylor remarked that the City would abandon the sewer line in Parcel B and sell or deed the land of Parcel B to the residents of Hyde-Berry Park if the residents of Hyde-Berry Park paid to relocate the sewer line under Parcel B.

110.    Taylor further said that if the Bloomfields and the other landowners in Hyde-Berry Park acquired Parcel B, then their residential and Open Space lots would be contiguous, removing

4904-3760-1707.v2

the City's reasons for denying the Bloomfields their ability to develop the barn and pool on their Open Space lot.

111.    On or about September 13, 2024, Bloomfield memorialized in an email to Scott Taylor his understanding of his conversation with Taylor: that the City would drop their objections to the Bloomfields' pool and barn only if the Bloomfields pay to replace, repair, or relocate the sewer line under the portion of Parcel B adjacent to their property and then convey to the City an access easement to Parcel B.

112.    Scott Taylor responded in substance that the discussion concerned determining what new sewer lines and infrastructure would have to be installed to abandon existing sewer lines within City-deeded property. Specifically, he wrote:

> There is a process that needs to be followed to acquire deeded property from the City or to abandon Public Utility Easements or City Rights-of-Way. The Development Services or Legal Services Departments could guide you through that process, and ultimately any sale of City property or abandonment of easement or rights-of-way requires City Council action. Our discussion yesterday was to determine what new sewer lines and infrastructure would have to be installed in order to abandon the existing sewer lines that are within the City's deeded property. I would be happy to facilitate a meeting with you and the Development Services and Legal Services Department to discuss the process. Ultimately, any action will require an agreement between the property owners and the City, clearly specifying certain terms and conditions that will need to be accepted and approved as a City Council action.

113.    Thereafter, the Bloomfields commissioned an estimate for the cost of the sewer line that Taylor asked the Bloomfields to replace or relocate. That estimate stated that the cost to relocate the sewer line was $240,000.

114.    Upon information and belief, the City council has endorsed the City's ultimatum to the Bloomfields regarding the Bloomfields replacing or relocating the City's sewer line in

21

exchange for the ability to build their barn and pool. This belief comes from statements made by Defendant John Willis and City attorney Ryan Dooley that the City council had been provided with all pertinent information relating to Parcel B, and Hyde-Berry Park residents' issues with Parcel B, and made its decision accordingly.

115. Other City representatives, including Sean Guzman and John Willis, have acknowledged in recorded conversations that for landowners in Hyde-Berry Park to receive Parcel B, the sewer line must be relocated, and someone besides the City will have to cover the cost. These statements imply that Hyde-Berry Park residents must pay to replace or relocate the sewer line at their own expense if they wish to develop their Open Space lots without City opposition.

116. The City has maintained this legal position despite its legal obligation to repair, replace, relocate if necessary, and maintain municipal sewer infrastructure. And the City accomplishes these tasks using taxes allocated in the City budget—taxes the Bloomfields and other Hyde-Berry Park residents already pay.

117. City representatives also acknowledged that if the sewer line behind the houses was relocated, the City would no longer need Parcel B and it could be deeded to owners or otherwise dealt with to make the residential and Open Space lots separated by Parcel B contiguous again.

118. The Bloomfields did not create the property issues surrounding Parcel B, including the noncontiguous residential and Open Space lots or the City's need to replace or relocate the sewer line beneath Parcel B.

119. Yet the City has used its permitting authority as leverage to pressure the Bloomfields, and possibly other Hyde-Berry Park residents, into funding the City's expressed desire  to replace or relocate the sewer line beneath Parcel B.

120.    The Bloomfields' planned pool and barn will have no effect on the City's municipal sewer infrastructure. These improvements will not disturb Parcel B or the City sewer line beneath it. Nor will the improvements otherwise create a need for the City to replace, relocate, abandon, or reconstruct its sewer infrastructure.

121.    The Bloomfields' planned pool and barn will not affect the City's control and management of Parcel B or its access to the City's municipal sewer infrastructure.

122.    The City's demand that the Bloomfields pay for the replacement or relocation of City sewer infrastructure as a condition of permits to erect improvements on their own land was not designed to mitigate any impact caused by the swimming pool or barn.

123.    Instead, the City's demand abuses the permitting process to coerce the Bloomfields into covering part of the cost of maintaining and (where necessary) relocating municipal infrastructure, as well as resolving a property-ownership issue created by the City's acquisition of fee-title ownership of utility corridors in Hyde-Berry Subdivision rather than easement rights.

F.    **Open Space, Vested Rights, and Plain-Language Land-Use Rules**

124.    The City's stated land-use rationale for stopping or impeding the Bloomfields' construction project shifted over time and was unsupported by any clear ordinance prohibiting construction of the swimming pool and barn on the Open Space lot.

125.    Plaintiffs repeatedly asked the City for specific ordinance citations supporting its position that the pool could not be constructed on the Open Space lot.

126.    The City failed to deliver a clear, timely, ordinance-based explanation before the Bloomfields relied on the City's approvals and incurred substantial expense.

23

127.    Under Utah Code Section 10-20-902, Plaintiffs possessed vested rights based on the land-use regulations in effect when their complete applications were submitted and fees were paid.

128.    Under Utah Code Section 10-20-901, land-use regulations must be applied according to their plain language and, where a regulation does not plainly restrict a proposed use, the regulation must be interpreted to favor the land-use application.

129.    The City's later reliance on unwritten limitations, post-issuance conditions, or shifting interpretations violated Plaintiffs' vested rights and statutory rights.

## G.    Medical Necessity and Accommodation

130.    Plaintiff Trina Bloomfield has significant spinal and mobility limitations.

131.    Trina's treating physician has stated that regular swimming and pool access are medically necessary for her rehabilitation, maintenance of function, pain control, conditioning, and independence.

132.    The swimming pool is a medically necessary accommodation arising from her disability-related needs.

133.    The Bloomfields placed or attempted to place the City on notice that the pool was medically necessary and that a disability-related accommodation was required.

134.    The City still continued to withhold approvals, utility access, inspections, and/or occupancy-related permissions and continued enforcement activity.

135.    The City failed to engage in a meaningful good-faith accommodation process.

## H.    Timeliness and Continuing Violations

136.    The City's violations of local, state, and federal law are ongoing.

24

137.    The City continues to refuse or impair inspections, utility approvals, completion approvals, property use, permit recognition, and/or relief from abuses of the permit process based on unlawful conditions.

138.    Each refusal to process, inspect, approve, connect utilities, lift unlawful conditions, or terminate enforcement constitutes a continuing and separate injury.

139.    The Bloomfields' federal constitutional claims are timely under the applicable limitations period for claims brought under 42 U.S.C. Section 1983.

140.    The Bloomfields' Americans with Disabilities Act and Fair Housing Act claims are timely because the City's refusal to accommodate and related enforcement misconduct are continuing.

141.    The Bloomfields' state-law claims are timely or otherwise subject to tolling, continuing-violation principles, equitable doctrines, or related statutory provisions.

142.    The Bloomfields have complied with the Governmental Immunity Act of Utah, Utah Code Title 63G, Chapter 7, by providing the City with a timely notice of claim and commencing this action appropriately.

**FIRST CAUSE OF ACTION**
**(Unconstitutional Exaction / Taking – Fifth Amendment; Fourteenth Amendment;**
**42 U.S.C. Section 1983)**

143.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

144.    The Fifth and Fourteenth Amendments prohibit the government from taking private property for public use without just compensation.

145.    The government imposes a taking when it conditions a building permit on an exaction that lacks a "nexus" and "rough proportionality" between "the property that the

25

government demands and the social costs of the applicant's proposal." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605-05 (2013) (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994)). Permit conditions that lack these elements of an essential nexus and rough proportionality are not "a valid regulation of land use but 'an out-and-out plan of extortion.'" *Nollan*, 483 U.S. at 837 (quoting *J.E.D. Assoc., Inc. v. Atkinson*, 432 A.2d 12, 14-15 (N.H. 1981)).

146.    "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation." *Koontz*, 570 U.S. at 607.

147.    The Bloomfields possess constitutionally protected property interests, including but not limited to:

    a.    Fee simple ownership of the affected undeveloped lot on which they wish to build a barn and a swimming pool;

    b.    Continued use and enjoyment of their real property;

    c.    Approved development rights; and

    d.    Vested land-use rights under Utah law.

148.    The City has offered to approve the Bloomfields' application to construct a barn and swimming pool on their property on two conditions: (a) They purchase from the City the adjoining municipal utility corridor (that the City labels Parcel B); and (b) they replace or relocate the sewer line running beneath the surface of that corridor at Plaintiffs' own expense.

    a.    The City's offer constitutes an unconstitutional condition on the Bloomfields' building permit: The City's demand that the Bloomfields purchase Parcel B

26

4904-3760-1707.v2

has no nexus with the Bloomfields' application to build a barn and swimming pool on their own property, because the barn and pool will not create any "negative externalities" affecting Parcel B that a forced purchase would mitigate.

b.  The City's demand that the Bloomfields purchase Parcel B is likewise not roughly proportional to any social costs of building a swimming pool on the Bloomfields' own property, because that use of their property imposes no social costs not already incorporated into the cost of additional water and utilities.

c.  The City's demand that the Bloomfields replace the sewer line at their expense has no nexus with the Bloomfields' application to build a barn and swimming pool on their own property, because the barn and pool will not create any "negative externalities" that replacing the sewer line would mitigate.

d.  The City's demand that the Bloomfields replace the sewer line at their expense is likewise not roughly proportional to the non-existent social costs of building a barn and swimming pool on the Bloomfields' property, because constructing improvements on their own property imposes no social costs not already incorporated into the cost of additional water and utilities.

149.  Because the City's permit conditions lack an essential nexus and rough proportionality, those conditions amount to "[e]xtortionate demands [that] … frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." *Koontz*, 570 U.S. at 605.

150.  The City's misconduct towards the Bloomfields constitutes municipal policy, custom, or practice under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

4904-3760-1707.v2

151. As a direct and proximate result of the City's unconstitutional exaction, the Bloomfields have suffered economic damages and delay damages from the City's burdens on their right not to have property taken without just compensation. *Koontz*, 570 U.S. at 607.

152. Because the City's permit conditions are unconstitutional, the Court should issue a declaration that the conditions are unconstitutional along with an injunction ordering the City to cease all enforcement actions and other obstacles to the Bloomfields' construction of a barn and swimming pool as authorized by the permit.

153. Plaintiffs are entitled to damages, declaratory relief, injunctive relief, attorneys' fees, costs, and all other appropriate relief.

## SECOND CAUSE OF ACTION
**(Procedural Due Process – Fourteenth Amendment; 42 U.S.C. Section 1983)**

154. The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

155. The Fifth and Fourteenth Amendments prohibit the government depriving a person of life, liberty, or property without "due process of law."

156. "[T]he central meaning of procedural due process" consists of "the right to notice and an opportunity to be heard," which must be "granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

157. The Bloomfields have a "legitimate claim of entitlement" to their permits, vested development rights, use and enjoyment of their property, and fair access to established permitting, inspection, utility, and occupancy procedures. *Gerhart v. Lake County, Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011).

158. The City deprived the Bloomfields of these property interests without adequate process by reversing permit approvals, withholding inspections and utilities, imposing new

4904-3760-1707.v2

conditions, threatening or pursuing enforcement, and refusing to allow completion or use of the pool and barn—all without notice and opportunity to be heard.

159.    The City failed to deliver timely and adequate notice of the alleged permit defect or the legal basis for the City's reversal.

160.    The City failed to provide a meaningful pre-deprivation hearing.

161.    The City failed to provide a fair, neutral, and adequate post-deprivation process.

162.    The City's conduct was arbitrary, inconsistent, and fundamentally unfair.

163.    The City acted under color of state law.

164.    The City's conduct reflected municipal policy, custom, practice, ratification, or decisions of final policymakers.

165.    The Bloomfields suffered economic and delay damages as a direct and proximate result.

**THIRD CAUSE OF ACTION**
**(Substantive Due Process – Fourteenth Amendment; 42 U.S.C. Section 1983)**

166.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

167.    The Fourteenth Amendment guarantees that no state will deprive a person of property without due process of law

168.    This right to the due process of law shields a property owner from egregious official conduct that is arbitrary in the constitutional sense. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Such actions manifest "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Klen v. City of Loveland*, 661 F.3d 498, 513 (10th Cir. 2011).

4904-3760-1707.v2

169.    The Bloomfields possess a "legitimate claim of entitlement" to their permits, vested development rights, use and enjoyment of their property, and fair access to established permitting, inspection, utility, and occupancy procedures. *Gerhart v. Lake County, Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011).

170.    The City's conduct in response to the Bloomfields' lawful application for permission to build improvements on their own property was arbitrary, irrational, conscience-shocking, and not reasonably related to legitimate land-use regulation.

171.    The City first represented approval or permissibility, induced reliance, and then reversed course after the Bloomfields incurred substantial expense.

172.    The City used permitting, inspections, utilities, occupancy approvals, trespass threats, and criminal enforcement as leverage to force the Bloomfields to resolve property ownership and utility maintenance issues that are the City's sole responsibility.

173.    The City's conduct constitutes a gross abuse of governmental power that shocks the conscience.

174.    The City acted under color of state law.

175.    The City's conduct was caused by municipal policy, custom, practice, ratification, or decisions of final policymakers.

176.    The Bloomfields suffered economic and delay damages as a direct and proximate result of the City's arbitrary and egregious actions.

**FOURTH CAUSE OF ACTION**
**(Equal Protection / Selective Enforcement – Fourteenth Amendment;**
**42 U.S.C. Section 1983)**

177.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

30

178.    The Fourteenth Amendment prohibits states from denying citizens equal protection of the laws.

179.    An equal protection claim is proper where the government intentionally treats a person or private organization one has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam); *Gerhart v. Lake Cnty. Mont.*, 637 F.3d 1013 (9th Cir. 2011).

180.    The City intentionally treated the Bloomfields differently from other similarly situated or reasonably comparable property owners.

181.    Other owners had or have Parcel B, utility-corridor, sewer-access, open-space, or permitting issues without encountering obstacles to building improvements on their own land as the City imposed on the Bloomfields.

182.    City representatives acknowledge that the enforcement actions they are pursuing against the Bloomfields involve problems caused by the City's sewer infrastructure requirements and its previous property-acquisition decisions for the Hyde-Berry Park Subdivision.

183.    Upon information and belief, the City has not pursued comparable exactions, enforcement proceedings, or criminal prosecution against similarly situated property owners.

184.    The City's differential treatment of the Bloomfields is irrational and abusive.

185.    The City has acted under color of state law.

186.    The City's conduct was caused by municipal policy, custom, practice, ratification, or decisions of final policymakers.

31

4904-3760-1707.v2

187.   The Bloomfields suffered economic and delay damages as a direct and proximate result of the City's differential treatment.

## FIFTH CAUSE OF ACTION
**(Title II of the Americans with Disabilities Act – 42 U.S.C. Section 12132)**

188.   The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

189.   Trina Bloomfield suffers from a disability recognized under the ADA.

190.   The City is a public entity subject to Title II of the ADA.

191.   Trina's disability substantially limits major life activities, including mobility, walking, standing, and daily functioning.

192.   Pool access is medically necessary for Trina's rehabilitation, pain control, mobility, function, and independence.

193.   The Bloomfields requested, attempted to request, or otherwise placed the City on notice of the need for a reasonable accommodation relating to completion and use of a medically necessary pool on the Bloomfields' property.

194.   The requested accommodation was reasonable and necessary.

195.   The City denied or constructively denied the Bloomfields' requested reasonable accommodation by withholding approvals, utilities, inspections, and/or occupancy permissions; imposing unlawful conditions; and continuing enforcement activity.

196.   The City failed to engage in a good-faith interactive process.

197.   The City has discriminated against Trina Bloomfield by denying the swimming pool permit, giving shifting reasons why a pool on the Open Space parcel is impermissible when other pools have been permitted on Open Space parcels in the same neighborhood, failing to identify required corrections, and failing to issue a clear approval or denial. The City also did not

4904-3760-1707.v2

reasonably accommodate Trina's medically necessary need for pool access and continued enforcement despite notice of that need.

198.    Plaintiffs are entitled to compensatory damages, declaratory relief, injunctive relief, attorneys' fees, costs, and all other appropriate relief.

**SIXTH CAUSE OF ACTION**
**(Fair Housing Act – 42 U.S.C. Section 3604(f))**

199.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

200.    The Bloomfields' property is a dwelling within the meaning of the FHA.

201.    Trina Bloomfield is a person with a disability within the meaning of the FHA.

202.    The City provides or controls zoning, permitting, inspection, utility, occupancy, enforcement, and other services or privileges connected with the Bloomfields' dwelling.

203.    Pool access is necessary to afford Trina equal opportunity to use and enjoy her dwelling.

204.    The Bloomfields requested, attempted to request, or otherwise placed the City on notice of the need for reasonable accommodation.

205.    The City refused or constructively refused to make a reasonable accommodation by withholding approvals, conditioning property use on unlawful demands, and pursuing enforcement.

206.    The City's conduct violated 42 U.S.C. Section 3604(f)(3)(B).

207.    The Bloomfields are entitled to damages, declaratory relief, injunctive relief, attorneys' fees, costs, and all other appropriate relief.

4904-3760-1707.v2

**SEVENTH CAUSE OF ACTION**
**(Unlawful Post-Issuance Conditions / Ultra Vires Action –**
**Utah Code Section 10-9a-509(1)(h))**

208.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

209.    The City issued or represented issuance of permits and approvals for the Bloomfields' application to build a barn and swimming pool on their property.

210.    After issuance or represented issuance, the City imposed new requirements and conditions not imposed at the time of permit approval.

211.    These post-issuance conditions included  utility-connection restrictions, Parcel B resolution demands, easement demands, removal demands, occupancy restrictions, and a demand to replace the sewer line under Parcel B at the Bloomfields' expense.

212.    Utah Code Section 10-9a-509(1)(h) prohibits a municipality from imposing post-issuance conditions not required at the time of permit approval.

213.    The City acted beyond its statutory authority.

214.    Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief.

**EIGHTH CAUSE OF ACTION**
**(Equitable Estoppel)**

215.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

216.    The City, through authorized personnel, represented that the Bloomfields' proposed improvements were permissible, that utilities could be routed or connected, and that permits or approvals had issued.

217.    The Bloomfields reasonably relied on the City's representations.

218.    The Bloomfields changed their position in reliance by incurring substantial design, engineering, construction, excavation, professional, and other costs.

34

219.    The City later repudiated or contradicted its prior representations.

220.    Exceptional circumstances exist because Plaintiffs relied on official City representations regarding land-use approvals and because manifest injustice would result if the City were allowed to reverse course and impose new conditions after the Bloomfields' reliance.

221.    The City should be equitably estopped from denying the validity or effect of its permit and other approvals, from imposing post-issuance conditions, and from invoking Parcel B or preexisting sewer infrastructure issues to block the Bloomfields' lawful use of their own property.

### NINTH CAUSE OF ACTION
**(Declaratory Judgment – 28 U.S.C. Sections 2201-02; Utah Code Section 78B-6-401)**

222.    The Bloomfields incorporate all preceding paragraphs as if fully set forth herein.

223.    An actual, present, and justiciable controversy exists between the Bloomfields and the City.

224.    The Bloomfields seek declarations that:

a.    The City's exaction demands violate the Takings Clause;

b.    The City may not condition the Bloomfields' barn, pool, utilities, inspections, occupancy, or property use on their agreement to purchase or resolve Parcel B or funding City sewer infrastructure;

c.    The Bloomfields did not create the City's need to repair, replace, or relocate the sewer line running beneath Parcel B or the conflicts between private owners and the City caused by its acquisition of fee title ownership of Parcel B;

d.    The Bloomfields' barn and pool would be located on their Open Space lot, not on Parcel B;

35

e.    The City unlawfully imposed post-issuance conditions;

f.    The City violated the Bloomfields' procedural and substantive due process rights;

g.    The City violated the Bloomfields' equal protection rights;

h.    The City violated the ADA and FHA;

i.    The City is equitably estopped from denying the effect of its approvals and representations; and

j.    Plaintiffs are entitled to completion, inspection, utility connection, and use of their improvements without unconstitutional or unlawful conditions.

## MUNICIPAL LIABILITY ALLEGATIONS

225.    The constitutional violations alleged above were caused by the City's official policies, customs, practices, decisions of final policymakers, ratification, and/or failure to train and supervise.

226.    City policymakers participated in, directed, approved, ratified, or knowingly acquiesced in the challenged conduct.

227.    The City's permitting, inspection, utility, enforcement, and legal personnel acted pursuant to municipal practice or policy.

228.    The City failed to train and supervise its personnel adequately regarding constitutional limits on land-use exactions, permit revocation, post-issuance conditions, due process, equal protection, ADA/FHA accommodation duties, and enforcement discretion.

229.    The City's municipal policies, customs, practices, ratification, and failures were the primary reason for Plaintiffs' injuries.

36

## DAMAGES

230.    Plaintiffs have suffered damages including, but not limited to:

    a.    Delay damages;

    b.    Construction, engineering, professional, and legal expenses;

    c.    Increased costs;

    d.    Loss of use and enjoyment of property;

    e.    Impairment of vested property rights;

    f.    Disability-related harm and loss of medically necessary pool access;

    g.    Emotional distress;

    h.    Reputational and enforcement-related harm;

    i.    Costs associated with responding to violation letters, stop-work orders, and criminal enforcement; and

    j.    Other damages to be proven at trial.

## ATTORNEYS' FEES

231.    The Bloomfields are entitled to recover reasonable attorneys' fees, expenses, and costs under 42 U.S.C. Sections 1983 and 1988, the ADA, the FHA, and any other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs James and Trina Bloomfield respectfully request that the Court enter judgment in their favor and against Defendant City of St. George as follows:

    A.    Declare that the City's exaction demands violate the Fifth Amendment;

37

4904-3760-1707.v2

B.      Declare that the City may not condition the Bloomfields' barn, pool, utilities, inspections, occupancy, or property use on the Bloomfields' agreement to purchase Parcel B or fund City sewer infrastructure;

C.      Declare that the City has violated the Bloomfields' constitutional rights;

D.      Declare that the City has violated the ADA and FHA;

E.      Declare that the City has violated Utah Code Section 10-9a-509(1)(h);

F.      Declare that the City is equitably estopped from denying or repudiating its approvals and representations;

G.      Enjoin the City from enforcing unconstitutional or unlawful conditions against the Bloomfields;

H.      Order the City to process, approve, inspect, connect utilities for, and allow completion and use of the Bloomfields' improvements without unconstitutional or unlawful conditions;

I.      Award compensatory damages in an amount to be proven at trial;

J.      Award attorneys' fees, expenses, and costs;

K.      Award pre-judgment and post-judgment interest as allowed by law; and

L.      Grant such other and further relief as the Court deems just and proper.

4904-3760-1707.v2

## JURY DEMAND

The Bloomfields demand a trial by jury on all issues so triable.

DATED this 3rd day of July, 2026.

> **KIRTON MCCONKIE**
>
> */s/ Jack M. Mitchell*
> Matthew C. Pruitt
> Jack M. Mitchell
> *Attorneys for Plaintiffs*

4904-3760-1707.v2